STATE OF NEBRASKA, APPELLEE, V.
ARTHUR LEE GALES, JR., APPELLANT.
658 N.W.2d 604

Filed March 28, 2003.    No. S-01-1231.

J. William Gallup, of Gallup & Schaefer, for appellant.

Jon Bruning, Attorney General, J. Kirk Brown, and, on brief, Don Stenberg, former Attorney General, for appellee.

Denise E. Frost and Clarence E. Mock III, of Johnson & Mock, for amicus curiae American Civil Liberties Union Nebraska Foundation, Inc.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

## I. INTRODUCTION

After a jury found Arthur Lee Gales, Jr., guilty of two counts of first degree murder and one count of attempted second degree murder, the trial judge conducted a sentencing hearing, made

factual findings, and sentenced Gales to death on each count of first degree murder and to not less than 50 nor more than 50 years' imprisonment on the count of attempted second degree murder. This is an automatic direct appeal from the death sentences as required by Neb. Rev. Stat. § 29-2525 (Cum. Supp. 2002). During the pendency of the appeal, but before it was briefed and argued, the U.S. Supreme Court decided *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), in which it held that a defendant in a capital case has a Sixth Amendment right to a jury determination of certain factual issues which determine whether a death sentence may be imposed. Subsequent to oral argument and submission of this appeal, the Nebraska Legislature enacted amendments to Nebraska's capital sentencing statutes in response to *Ring*. This case presents our first opportunity to assess the impact of *Ring* on Nebraska's capital sentencing statutes and to determine the applicability of the recent amendments to those statutes.

## II. FACTS AND PROCEDURAL HISTORY

A three-count information was filed against Gales on May 22, 2001. Count I charged Gales with first degree murder based on an allegation that on or about November 12, 2000, he purposely and with deliberate and premeditated malice or during the perpetration of a first degree sexual assault killed Latara Chandler (Latara). Count II charged first degree murder based upon an allegation that on or about November 12, Gales purposely and with deliberate and premeditated malice killed Tramar Chandler (Tramar). Count III charged Gales with attempted second degree murder, alleging that on or about November 12, he intentionally, but without premeditation, attempted to kill Judy Chandler (Chandler). Gales entered pleas of not guilty to all charges.

A jury trial commenced on August 20, 2001. Evidence received at trial revealed that Gales was present with Chandler and her children, Latara and Tramar, at Chandler's apartment in Omaha, Nebraska, between 10 and 11 p.m. on November 11, 2000. On the following morning, Chandler was found badly beaten and incoherent near 15th and Grace Streets in Omaha. After Chandler was identified, police learned that she had children. At approximately 5:30 p.m. on November 12, police entered Chandler's apartment

to check on the children and discovered 13-year-old Latara's body, nude from the waist down, in a bedroom. Seven-year-old Tramar's body was found with his torso positioned face up in the bathtub and his legs outside the bathtub. Autopsies revealed that Latara died as a result of manual strangulation and that Tramar died as a result of drowning and manual strangulation. The examining pathologist testified that each child had been subjected to at least 4 minutes of continuous compression of the neck before death. Latara had been sexually assaulted. The pathologist could not pinpoint the exact time of death for either child.

The State's theory at trial was that Gales and Chandler left Chandler's children at her apartment on the evening of November 11, 2000, and subsequently became involved in an altercation in which Gales severely beat Chandler and left her for dead. The State contended that Gales realized the children were witnesses who could place him with Chandler that evening and that he therefore returned to the apartment and killed them. Gales did not testify or offer evidence at trial and did not dispute the State's general theory of how the deaths of the children occurred. His defense was that he was not the person who assaulted Chandler and killed the children. The State presented DNA evidence which linked Gales to both crime scenes and excluded other potential suspects.

On August 27, 2001, the jury returned a verdict finding Gales guilty of two counts of first degree murder and one count of attempted second degree murder. On August 28, the district court entered an "Order of Judgment of Conviction," in which it accepted the verdict of the jury and adjudged Gales guilty on all three counts. The court scheduled a sentencing hearing for October 23.

Subsequently to entry of the judgment of conviction and prior to the sentencing hearing, Gales filed a motion challenging the constitutionality of the Nebraska capital sentencing statutes. He asserted that "[p]ursuant to *Jones v. United States*, 526 U.S. 227[, 119 S. Ct. 1215, 143 L. Ed. 2d 311] (1999) and *Apprendi v. New Jersey*, [530] U.S. [466], 120 S. Ct. 2348[, 147 L. Ed. 2d 435] (2000), the Defendant is entitled to a new trial for jury determination of sentence." In the alternative, Gales sought a new trial "for Jury determination of statutory aggravating and

mitigating circumstances." This motion was heard at the commencement of the sentencing hearing and overruled. At the same time, the court overruled a defense motion to convene a three-judge sentencing panel.

The sentencing hearing was conducted by the judge who presided at Gales' trial. On November 6, 2001, Gales appeared before the court for the imposition of sentence. The court issued a written order of sentence on that date in which it found that certain statutory aggravating circumstances existed. First, the court found that Gales was previously convicted of another crime involving the use or threat of violence to a person, the aggravating circumstance enumerated in Neb. Rev. Stat. § 29-2523(1)(a) (Cum. Supp. 2002), because Gales had prior convictions for armed sexual battery and strong-armed robbery. The court found this aggravating circumstance applicable to both counts of first degree murder.

Second, the court found that Gales committed the murders of both children in an effort to conceal his identity as the perpetrator of the attempted murder of Chandler, thus meeting aggravating circumstance § 29-2523(1)(b). Relying upon evidence produced at trial, the court concluded that Gales assaulted Chandler, left her for dead, and then returned to the apartment to kill the children because they were witnesses.

Third, the court found that the murder of Latara was "especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence," so that aggravating circumstance § 29-2523(1)(d) was met. Relying upon evidence produced at trial, the court concluded that the sexual abuse inflicted upon Latara prior to her death combined with the manual strangulation were sufficient to satisfy this aggravator. The court concluded that this aggravating circumstance was not met as to the death of Tramar.

Finally, the court found that aggravating circumstance § 29-2523(1)(e), "[a]t the time the murder was committed, the offender also committed another murder," was applicable to the deaths of both children. Relying upon evidence received at trial, the court found that Gales was present in Chandler's apartment at 11 p.m. on November 11, 2000. The court further found that Gales was the man who witnesses indicated was inside the

apartment at 4 a.m. on November 12. Reasoning that no one reported seeing or hearing from the children after 11 p.m. on November 11, the court found that the children were murdered some time during the early morning hours of November 12.

In addressing mitigating circumstances, the court determined that no evidence supported a finding of any statutory mitigator. The court found evidence to support a nonstatutory mitigator that Gales maintained a strong relationship with his family. In balancing the aggravating and mitigating circumstances, the court concluded that the one mitigator did not approach or exceed the aggravators in either murder. The court then considered whether a sentence of death in either murder was excessive or disproportionate to the penalty imposed in similar cases and concluded that it was not. Accordingly, the court imposed consecutive sentences of death on each count of first degree murder and a sentence of imprisonment for a period of not less than 50 nor more than 50 years on the count of attempted second degree murder.

## III. ASSIGNMENT OF ERROR

Gales' sole assignment of error is that the district court "erred in denying appellant's motions challenging the constitutionality of Nebraska Revised Statute Section 29-2519 (1995) et seq. and requesting a jury determination of sentencing issues." He assigns no error with respect to the jury's determination of guilt on the two counts of first degree murder, or with respect to his conviction and sentence on the one count of attempted second degree murder.

## IV. STANDARD OF REVIEW

Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the trial court. *State v. Gamez-Lira*, 264 Neb. 96, 645 N.W.2d 562 (2002); *State v. Turner*, 263 Neb. 896, 644 N.W.2d 147 (2002).

## V. ANALYSIS

### 1. BACKGROUND

The Sixth Amendment to the U.S. Constitution guarantees the right to "public trial, by an impartial jury" in criminal prosecutions. The Eighth Amendment to the U.S. Constitution forbids

the infliction of "cruel and unusual punishments." Both are made applicable to the states through the 14th Amendment. See, *Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002) (Eighth amendment); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (Sixth amendment). The recent decision of the U.S. Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), marks the convergence of two lines of federal constitutional authority: one addressing procedures which states must follow in order to implement capital punishment in conformity with the Eighth Amendment, and the other dealing with the extent to which the Sixth Amendment guarantees a right to a jury determination of the existence of facts which increase the penalty for a crime. Because the parties dispute the scope of the Court's holding in *Ring*, we begin our analysis by examining its jurisprudential underpinnings.

(a) Eighth Amendment Capital Sentencing Requirements

"Murder in the first degree" was first defined as a separate offense in Nebraska in 1873. Gen. Stat., ch. 2, § 3, p. 720 (1873). It was made punishable by death. 2 Comp. Laws, ch. 2, § 3, p. 647 (1866-77); Consol. Stat., ch. 1, § 5579, p. 1123 (1891); *Sundahl v. State*, 154 Neb. 550, 48 N.W.2d 689 (1951). In 1893, the Legislature amended the law to provide that a person convicted of first degree murder "shall suffer death or shall be imprisoned in the penitentiary during life, in the discretion of the jury." 1893 Gen. Laws, ch. 44, § 1, p. 386, subsequently codified at Neb. Rev. Stat. § 28-401 (1943), and later recodified at Neb. Rev. Stat. § 28-303 (Reissue 1995). In *Sundahl*, this court rejected a contention that the trial court erred in refusing to give a jury instruction that specified factors which the jury could or could not consider in exercising its discretion to impose a penalty of death pursuant to § 28-401. This court relied upon the interpretation of a similar federal statute by the U.S. Supreme Court in *Winston v. United States*, 172 U.S. 303, 313, 19 S. Ct. 212, 43 L. Ed. 456 (1899), in which the Court construed the jury's right to impose the death penalty as follows: "The act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right; but commits the whole matter of its

exercise to the judgment and the consciences of the jury." This court subsequently applied this same principle in holding that a trial court was not required to instruct the jury that it should impose a sentence of life imprisonment under § 28-401 if it had a reasonable doubt as to whether the death penalty was appropriate. *Grandsinger v. State,* 161 Neb. 419, 73 N.W.2d 632 (1955).

The principle of unrestricted discretion to impose the death penalty met its constitutional demise in *Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). In that case, which involved appeals from death sentences imposed under the laws of Georgia and Texas, the U.S. Supreme Court was asked to declare that the death penalty was unconstitutional because it constituted cruel and unusual punishment in violation of the Eighth Amendment. Two members of the Court held that the death penalty constituted cruel and unusual punishment under any circumstances. *Furman, supra* (Brennan, J., concurring; Marshall, J., concurring). Three other members of the Court, Justices Douglas, White, and Stewart, did not reach that issue, but concluded that the Georgia and Texas statutory procedures which gave a jury complete discretion to impose a death sentence violated the Eighth Amendment because they afforded "no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman,* 408 U.S. at 313 (White, J., concurring). Justice Stewart further noted that the death penalty as administered in Georgia and Texas was cruel and unusual "in the same way being struck by lightning is cruel and unusual" in that it was "wantonly and . . . freakishly imposed." *Furman,* 408 U.S. at 309-10. The remaining four justices dissented.

The Court subsequently characterized *Furman* as requiring that in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

*Gregg v. Georgia,* 428 U.S. 153, 199, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). In *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), the Court further interpreted *Furman* and *Gregg* to mean that "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor

and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." More specifically, the Court stated that capital sentencing statutes "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Id.* While articulating these general principles, the Court has been "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v. Florida*, 468 U.S. 447, 464, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984). See, *Pulley v. Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984); *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Gregg, supra.*

In response to *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the Nebraska Legislature enacted a new capital sentencing procedure, 1973 Neb. Laws, L.B. 268. See, Neb. Rev. Stat. §§ 29-2519 to 29-2546 (Reissue 1995 & Cum. Supp. 2002) (entitled "Special Procedure in Cases of Homicide"); *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986). In enacting this new procedure, the Legislature specifically found that "it is reasonable and necessary to establish mandatory standards for the imposition of the sentence of death"; that prior law "fail[ed] to allow for mitigating factors which may dictate against the penalty of death; and that the rational imposition of the death sentence requires the establishment of specific legislative guidelines to be applied in individual cases by the court." 1973 Neb. Laws, L.B. 268. See § 29-2519.

Nebraska's statutory capital sentencing procedures which were in effect at the time that Gales was convicted and sentenced were substantially similar to those enacted following *Furman*. Under these procedures, the determination of whether the defendant should be sentenced to death or life imprisonment was required to be made following a sentencing hearing by the judge who presided over the trial or accepted the guilty plea, or by a three-judge sentencing panel. § 29-2520. Section 29-2521 further provided:

> In the proceeding for determination of sentence, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to

any of the aggravating or mitigating circumstances set forth in section 29-2523. Any such evidence which the court deems to have probative value may be received. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death. The court shall set forth the general order of procedure at the outset of the sentence determination proceeding.

Section 29-2523, which was in effect at the time of Gales' convictions and sentencing, provided:

The aggravating and mitigating circumstances referred to in sections 29-2521 and 29-2522 shall be as follows:

(1) Aggravating Circumstances:

(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial prior history of serious assaultive or terrorizing criminal activity;

(b) The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of such crime;

(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;

(e) At the time the murder was committed, the offender also committed another murder;

(f) The offender knowingly created a great risk of death to at least several persons;

(g) The victim was a public servant having lawful custody of the offender or another in the lawful performance of his or her official duties and the offender knew or should have known that the victim was a public servant performing his or her official duties;

(h) The murder was committed knowingly to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws; or

(i) The victim was a law enforcement officer engaged in the lawful performance of his or her official duties as a law

enforcement officer and the offender knew or reasonably should have known that the victim was a law enforcement officer.

The facts upon which the applicability of an aggravating circumstance depends must be proved beyond a reasonable doubt.

(2) Mitigating Circumstances:

(a) The offender has no significant history of prior criminal activity;

(b) The offender acted under unusual pressures or influences or under the domination of another person;

(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;

(d) The age of the defendant at the time of the crime;

(e) The offender was an accomplice in the crime committed by another person and his or her participation was relatively minor;

(f) The victim was a participant in the defendant's conduct or consented to the act; or

(g) At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication.

Section 29-2522 provided:

After hearing all of the evidence and arguments in the sentencing proceeding, the judge or judges shall fix the sentence at either death or life imprisonment, but such determination shall be based upon the following considerations:

(1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death;

(2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In each case in which the court imposes the death sentence, the determination of the court shall be in writing and shall be supported by written findings of fact based upon the records of the trial and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination.

If an order is entered sentencing the defendant to death, a date for execution shall not be fixed until after the conclusion of the appeal provided for by section 29-2525.

The law further provided for automatic review of a death sentence by this court. § 29-2525.

■ Nebraska's post-*Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), capital sentencing procedure was similar to that of many states in that it employed a process of determining and balancing aggravating and mitigating circumstances. The U.S. Supreme Court has characterized this process as consisting of an "eligibility decision," in which there must be a determination of the existence of one or more of the prescribed aggravating circumstances before a defendant convicted of a capital crime is eligible for a sentence of death, and a "selection decision," in which the sentencer determines whether a defendant eligible for the death penalty should in fact receive it, based upon an individualized determination of the character of the individual and the circumstances of the crime. *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994). See, also, *State v. Moore*, 250 Neb. 805, 553 N.W.2d 120 (1996), *disapproved on other grounds, State v. Reeves*, 258 Neb. 511, 604 N.W.2d 151 (2000). The Court has stated that in order for a capital sentencing scheme to comply with the Eighth Amendment to the U.S. Constitution, "it must perform a narrowing function with respect to the class of persons eligible for the death penalty and must also ensure that capital sentencing decisions rest upon an individualized inquiry." *Jones v. United States*, 527 U.S. 373, 381, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999).

Nebraska's capital sentencing scheme, as it existed at the time of Gales' sentencing, differed from that of most other states in that it required a judge or panel of judges to decide whether a defendant convicted of a capital crime should be sentenced to

death or life imprisonment. See § 29-2520. After *Furman, supra*, most state legislatures chose to place this responsibility on a jury. See, Ark. Code Ann. § 5-4-602 (1997); Cal. Penal Code Ann. § 190.3 (West 1999); Conn. Gen. Stat. § 53a-46a (2001); Ga. Code Ann. § 17-10-31.1 (1997); 720 Ill. Comp. Stat. Ann. § 5/9-1(d) (Lexis Cum. Supp. 2002); Kan. Stat. Ann. § 21-4624(b) (1995); Ky. Rev. Stat. Ann. § 532.025(1)(b) (Michie Cum. Supp. 2002); La. Code Crim. Proc. Ann., art. 905.1 (West 1997); Md. Ann. Code Crim. Law § 2-303(c) (2002); Miss. Code Ann. § 99-19-101 (2000); Mo. Ann. Stat. §§ 565.030 and 565.032 (West Supp. 2003); Nev. Rev. Stat. § 175.552 (2001); N.H. Rev. Stat. Ann. § 630:5(II) (1996); N.J. Stat. Ann. § 2C:11-3c (West Supp. 2002); N.M. Stat. Ann. § 31-20A-1 (Michie 2000); N.Y. Crim. Proc. Law § 400.27 (McKinney Cum. Supp. 2003); N.C. Gen. Stat. § 15A-2000 (2002); Ohio Rev. Code Ann. § 2929.03 (West 2002); Okla. Stat. Ann. tit. 21, § 701.10(A) (West 2002); Ore. Rev. Stat. § 163.150 (2001); 42 Pa. Stat. Ann. § 9711 (West Cum. Supp. 2002); S.C. Code Ann. § 16-3-20(B) (West Cum. Supp. 2000); S.D. Codified Laws § 23A-27A-2 (Michie 1998); Tenn. Code Ann. § 39-13-204 (Supp. 2002); Tex. Crim. Proc. Code Ann. § 37.071 (Vernon Cum. Supp. 2003); Utah Code Ann. § 76-3-207 (Supp. 2002); Va. Code Ann. § 19.2-264.3 (2000); Wash. Rev. Code § 10.95.050 (2002); Wyo. Stat. Ann. § 6-2-102 (2001). Of the 38 states which authorized capital punishment at the time that *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), was decided, 29 states committed sentencing decisions to juries; 5 states, including Arizona and Nebraska, entrusted both capital sentencing factfinding and sentencing determination to judges; and 4 states utilized hybrid systems, whereby juries rendered advisory verdicts but a judge made the final sentencing determination. *Ring, supra.*

After *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and prior to *Ring, supra*, the U.S. Supreme Court decided several cases addressing the issue of whether jury sentencing is constitutionally required in capital cases. *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), was the first in a series of U.S. Supreme Court cases involving Florida's capital sentencing statutes which permitted a jury to

return an advisory verdict on sentencing, but reserved to the trial judge the ultimate authority to determine the sentence after independently weighing the aggravating and mitigating circumstances. The Court observed that the principal difference between Florida's post-*Furman* capital sentencing statutes and those of Georgia which were upheld in *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), was the fact that in Florida, the sentence was determined by the judge rather than by the jury. Noting its observation in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), that jury sentencing in a capital case can perform an important societal function, the plurality in *Proffitt* reasoned

> but it has never [been] suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition [of sentence] at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.

428 U.S. at 252. The plurality concluded that because Florida gave trial judges "specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life," the Florida statutes, like those of Georgia upheld in *Gregg*, "pass[ed] constitutional muster." *Proffitt*, 428 U.S. at 253, 259.

This court relied upon *Proffitt* in rejecting a challenge to Nebraska's post-*Furman* capital sentencing scheme in *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), *disapproved on other grounds, State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990). The defendant argued that our capital sentencing scheme was unconstitutional because it did not provide for the involvement of a jury in sentencing. Based upon *Proffitt*, we unanimously concluded:

> As we understand the federal and the state constitutional provisions, they do not require or even suggest that jury sentencing is constitutionally required. Whatever the relative merits of sentencing by a judge or jury may be, we need not consider them. Our concern is the constitutionality of the Nebraska system, under the federal and state Constitutions.

The relative merits of the one or the other is for legislative and not judicial determination.

*Simants*, 197 Neb. at 559, 250 N.W.2d at 888.

The U.S. Supreme Court revisited the Florida capital sentencing scheme in *Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984), a first degree murder case in which the trial judge set aside the jury's advisory life sentence and imposed the death penalty based in part upon evidence of a prior conviction which had not been submitted to the jury. Rejecting the petitioner's "fundamental premise . . . that the capital sentencing decision is one that, in all cases, should be made by a jury," the Court held:

This Court's decisions indicate that the discretion of the sentencing authority, whether judge or jury, must be limited and reviewable. . . . The sentencer is responsible for weighing the specific aggravating and mitigating circumstances the legislature has determined are necessary touchstones in determining whether death is the appropriate penalty. Thus, even if it is a jury that imposes the sentence, the "community's voice" is not given free rein. The community's voice is heard at least as clearly in the legislature when the death penalty is authorized and the particular circumstances in which death is appropriate are defined. . . .

We do not denigrate the significance of the jury's role as a link between the community and the penal system and as a bulwark between the accused and the State. . . . *The point is simply that the purpose of the death penalty is not frustrated by, or inconsistent with, a scheme in which the imposition of the penalty in individual cases is determined by a judge.*

(Citations omitted.) (Emphasis supplied.) *Spaziano*, 468 U.S. at 458, 462-63. The Court acknowledged that the majority of state capital sentencing statutes authorized juries to impose the sentence, but held that this fact did not invalidate Florida's scheme by which the trial judge had final sentencing authority. The Court reasoned that "[t]he Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws." 468 U.S. at 464. It concluded:

In light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional.

As the Court several times has made clear, we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme.

468 U.S. at 464.

In *Hildwin v. Florida*, 490 U.S. 638, 640, 109 S. Ct. 2055, 104 L. Ed. 2d 728 (1989), the Court characterized the statutory aggravating circumstances which must be found before a death sentence may be imposed as "'sentencing factor[s]'" which come into play only after a determination of guilt, and not as elements of the offense. The Court concluded that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." 490 U.S. at 640-41. This court specifically relied on *Hildwin* in rejecting a claim that § 29-2522 was unconstitutional on the ground that it denied a criminal defendant the right to have a jury determine the factual issues comprising first degree murder. *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989).

In *Enmund v. Florida*, 458 U.S. 782, 797, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), the Court held that the principles of proportionality embodied in the Eighth Amendment preclude the imposition of the death penalty on "one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." In *Cabana v. Bullock*, 474 U.S. 376, 106 S. Ct. 689, 88 L. Ed. 2d 704 (1986), *abrogated on other grounds, Pope v. Illinois*, 481 U.S. 497, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987), the Court was presented with the issue of whether the existence of facts necessary to impose the death penalty under the rule in *Enmund* must be determined by a jury. The Court began its analysis by noting that neither the Mississippi jury's verdict of guilt nor its sentence of death "necessarily reflect[ed] a finding that Bullock

killed, attempted to kill, or intended to kill." *Cabana*, 474 U.S. at 383. Although the Court determined that the Mississippi court would be required to make the *Enmund* determination in order for the death sentence to stand, it concluded that "[t]he proceeding that the state courts must provide Bullock need not take the form of a new sentencing hearing before a jury." *Cabana*, 474 U.S. at 392. The Court observed that it had never required a jury to make the determination of whether a particular sentence was appropriate in any given case and noted that in *Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984), it "specifically rejected the argument that the Sixth Amendment or any other constitutional provision provides a defendant with the right to have a jury consider the appropriateness of a capital sentence." *Cabana*, 474 U.S. at 385-86. The Court concluded that the categorical rule of *Enmund* is a "substantive limitation on sentencing, and like other such limits it need not be enforced by the jury." *Cabana*, 474 U.S. at 386. The Court reiterated its prior statements to the effect that a state "has considerable freedom to structure its capital sentencing system as it sees fit" and that there is no " 'one right way' " to accomplish this task. 474 U.S. at 386-87, quoting *Spaziano, supra.*

The U.S. Supreme Court first considered a challenge to Arizona's capital sentencing scheme in *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). The Arizona statutes at issue provided that when a defendant was convicted by a judge or jury of first degree murder, the sentence would be determined after the judge, sitting without a jury, determined the existence of aggravating and mitigating circumstances, and whether there were sufficient mitigating circumstances to warrant a sentence of life imprisonment instead of death. Walton argued on appeal that

> every finding of fact underlying the sentencing decision must be made by a jury, not by a judge, and that the Arizona scheme would be constitutional only if a jury decides what aggravating and mitigating circumstances are present in a given case and the trial judge then imposes sentence based on those findings.

497 U.S. at 647. In rejecting this argument, the Court noted that it had "repeatedly . . . rejected constitutional challenges to Florida's

death sentencing scheme, which provides for sentencing by the judge, not the jury." *Id.*, citing *Hildwin v. Florida*, 490 U.S. 638, 109 S. Ct. 2055, 104 L. Ed. 2d 728 (1989), *Spaziano, supra*, and *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976). The Court also rejected Walton's claim that aggravating circumstances under the Arizona statute were " 'elements of the offense,' " noting that the finding of any particular aggravating circumstance does not in itself convict a defendant or require the death penalty, and the failure to find any particular aggravating circumstance does not " ' "acquit" ' " or preclude the death penalty. *Walton*, 497 U.S. at 648. The Court further relied on its holding in *Cabana v. Bullock*, 474 U.S. 376, 106 S. Ct. 689, 88 L. Ed. 2d 704 (1986), *abrogated on other grounds, Pope v. Illinois*, 481 U.S. 497, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987), that the findings required by *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), need not be made by a jury. In rejecting another of Walton's claims, the Court held that a "defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 650.

### (b) Sixth Amendment Right to Jury Determination of Facts Affecting Punishment

■ Due process of law requires the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Applying this principle, the U.S. Supreme Court held that a Maine law which required a defendant charged with murder to prove that he acted " 'in the heat of passion on sudden provocation' " in order to reduce the charge to manslaughter constituted a denial of due process. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). The Court reasoned that because the absence of "heat of passion" was a critical fact distinguishing the offense of murder from the offense of manslaughter, which carried a lesser penalty, due process "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." 421 U.S. at 702, 704.

However, in *Patterson v. New York*, 432 U.S. 197, 198, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), the Court upheld the constitutionality of a statute which created an affirmative defense whereby a defendant charged with second degree murder could obtain a reduction of the charge to manslaughter by showing that he acted under " 'extreme emotional disturbance.' " The Court reasoned that *Mullaney* could not be read so broadly as to prohibit the State from permitting "the blameworthiness of an act or the severity of punishment authorized for its commission to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact . . . beyond a reasonable doubt." *Patterson*, 432 U.S. at 214. The majority in *Patterson* reasoned that the State's recognition of extreme emotional disturbance as a "mitigating circumstance" which differentiates murder from manslaughter "does not require the State to prove its nonexistence in each case in which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate." 432 U.S. at 209. The dissent in *Patterson* rejected the majority's distinction of *Mullaney*, noting that the majority's explanation of the *Mullaney* holding "bears little resemblance to the basic rationale of that decision." *Patterson*, 432 U.S. at 222-23 (Powell, J., dissenting; Brennan and Marshall, JJ., join).

The majority opinion in *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), addressed the tension in *Mullaney* and *Patterson* by focusing upon the distinction between elements of an offense and sentencing considerations which affect punishment, noting that only facts which constitute elements must be proved by the prosecution beyond a reasonable doubt. The Pennsylvania statute under consideration in *McMillan* provided that anyone convicted of certain enumerated felonies was subject to a mandatory minimum sentence of 5 years' imprisonment if the judge determined, at a sentencing hearing, that the defendant " 'visibly possessed a firearm' " during the commission of the offense. 477 U.S. at 81. The majority reasoned that by enacting this mandatory minimum sentencing scheme, the Pennsylvania Legislature did not change the elements of existing offenses, but, rather, dictated the weight which

should be given to "one factor that has always been considered by sentencing courts to bear on punishment—the instrumentality used in committing a violent felony." 477 U.S. at 89. Citing *Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984), the Court also rejected a claim that the mandatory minimum sentencing scheme impinged upon the petitioners' right to trial by jury, noting that "there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." *McMillan*, 477 U.S. at 93.

In *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), the Court relied upon its reasoning in *Spaziano, supra*, and *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In *Almendarez-Torres*, the Court considered a federal criminal statute forbidding a deported alien to return to the United States without special permission. One section of the statute authorized a prison term of up to 2 years, but another section authorized a sentence of imprisonment of up to 20 years if the initial " 'deportation was subsequent to a conviction for commission of an aggravated felony.' " 523 U.S. at 229, quoting 8 U.S.C. § 1326(b)(2) (1994). The Court held that the provision of the statute authorizing the greater penalty constituted a "sentencing factor." 523 U.S. at 235. In rejecting a contention that the Court should treat the prior conviction as a separate element of the offense, the Court noted that "such a rule would seem anomalous in light of existing case law that permits a judge, rather than a jury, to determine the existence of factors that can make a defendant eligible for the death penalty." 523 U.S. at 247, citing *Walton, supra, Hildwin v. Florida*, 490 U.S. 638, 109 S. Ct. 2055, 104 L. Ed. 2d 728 (1989), and *Spaziano, supra*.

However, a year later, in *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), the Court considered a federal carjacking statute which provided for an enhanced penalty if serious bodily injury resulted from the carjacking, and a further enhancement in the event of a resulting death. See 18 U.S.C. § 2119 (2000). The majority concluded that the statute defined three separate offenses, each of which must be charged by indictment and proved to a jury beyond a reasonable doubt. Writing in dissent, Justice Kennedy noted that the reasoning of

the majority was inconsistent with *Walton* and predicted that "[r]eexamination of this area of our capital jurisprudence can be expected." *Jones*, 526 U.S. at 272.

██ The next decision in this line of authority was *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). In *Apprendi*, the defendant entered a guilty plea to two counts of possession of a firearm for an unlawful purpose, an offense carrying a penalty range of 5 to 10 years' imprisonment. After the pleas were accepted, the trial judge conducted an evidentiary hearing pursuant to the New Jersey " 'hate crime' " enhancement statute which permitted an enhanced penalty if the crime was committed " 'with a purpose to intimidate . . . because of race.' " *Apprendi*, 530 U.S. at 468-69. Based on a preponderance of the evidence, the trial judge found the requisite intent because the crime was " 'motivated by racial bias' " and imposed an enhanced sentence. 530 U.S. at 471. The New Jersey Supreme Court affirmed. *State v. Apprendi*, 159 N.J. 7, 731 A.2d 485 (1999). The U.S. Supreme Court granted certiorari and reversed, with the majority holding that under the Due Process Clause of the 14th Amendment, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Noting the "constitutionally novel and elusive distinction between 'elements' and 'sentencing factors' " drawn in *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), the Court stated: "Despite what appears to us the clear 'elemental' nature of the [intent] factor here, the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494. The majority concluded that the New Jersey hate crime enhancement statute had that effect and therefore triggered a constitutional requirement that pertinent facts be determined by a jury beyond a reasonable doubt. Relying in part upon a dissenting opinion of one of its members in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), the *Apprendi* majority concluded that its holding was not inconsistent with *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047,

111 L. Ed. 2d 511 (1990). Writing in dissent, Justice O'Connor disagreed, stating:

> If a State can remove from the jury a factual determination that makes the difference between life and death, as *Walton* holds that it can, it is inconceivable why a State cannot do the same with respect to a factual determination that results in only a 10-year increase in the maximum sentence to which a defendant is exposed.

*Apprendi*, 530 U.S. at 537.

## 2. *RING V. ARIZONA*

Timothy Stuart Ring participated in an armored van robbery in Glendale, Arizona, in which the driver of the van was killed. At his trial, the jury was instructed on alternative charges of premeditated murder and felony murder. The jury reached a deadlock on the premeditated murder charge, but convicted Ring of felony murder. A separate sentencing hearing was then conducted by the trial judge, sitting without a jury, as required under Arizona's capital sentencing statutes then in effect. See Ariz. Rev. Stat. Ann. § 13-703(C) (West Supp. 2001). Arizona law provided that the penalty for first degree murder was death or life imprisonment, but specified that the death penalty could be imposed only if the trial judge found at least 1 of 10 statutory "aggravating circumstance[s]" and " 'no mitigating circumstances sufficiently substantial to call for leniency.' " *Ring v. Arizona*, 536 U.S. 584, 593, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); § 13-703(F) and (G).

Based upon testimony at the sentencing hearing by one of Ring's accomplices, the trial judge found that Ring was a major participant in the robbery and that he fired the fatal shot. The judge found that two statutory aggravating circumstances existed and that one nonstatutory mitigator existed but did not warrant leniency. Based upon these findings, Ring was sentenced to death.

On direct appeal to the Arizona Supreme Court, Ring argued on the basis of *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), that the Arizona capital sentencing scheme violated the 6th and 14th Amendments to the U.S. Constitution. *State v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (2001). While noting that the U.S. Supreme

Court did not overrule *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), in its subsequent decisions in *Jones* and *Apprendi*, the Arizona Supreme Court acknowledged that those cases cast doubt upon the continued viability of *Walton*. After quoting Justice O'Connor's dissenting opinion which took issue with the manner in which the *Apprendi* majority characterized Arizona's capital sentencing scheme in distinguishing *Walton*, the Arizona Supreme Court agreed with Justice O'Connor's characterization, stating:

> In Arizona, a defendant cannot be put to death solely on the basis of a jury's verdict, regardless of the jury's factual findings. The range of punishment allowed by law on the basis of the verdict alone is life imprisonment with the possibility of parole or imprisonment for "natural life" without the possibility of release. . . . It is only after a subsequent adversarial sentencing hearing, at which the judge alone acts as the finder of the necessary statutory factual elements, that a defendant may be sentenced to death. . . . And even then a death sentence may not legally be imposed by the trial judge unless at least one aggravating factor is found to exist beyond a reasonable doubt. . . . Thus, when the state seeks the death penalty, a separate evidentiary hearing, without a jury, must be held; the death sentence becomes possible only after the trial judge makes a factual finding that at least one aggravating factor is present. The judge makes that finding on the basis of the evidence presented at trial and any other evidence presented at the aggravation/mitigation hearing. . . . If the judge finds an aggravating circumstance, he must then proceed to determine if there are any mitigating circumstances. . . . If the judge finds mitigating circumstances, he must then weigh them against the aggravators and decide by "special verdict" whether a death sentence is appropriate.

(Citations omitted.) *State v. Ring*, 200 Ariz. at 279, 25 P.3d at 1151. Rejecting Ring's argument that *Walton* could not stand after *Apprendi*, the Arizona Supreme Court determined that it was bound by the Supremacy Clause to follow the "controlling authority" of *Walton*. *State v. Ring*, 200 Ariz. at 280, 25 P.3d at 1152. Although it determined that there was insufficient evidence to

support one of the aggravating circumstances found by the trial judge, the court concluded that the mitigating circumstance balanced against the remaining aggravating circumstance did not warrant leniency, and therefore affirmed the death sentence. *Id.*

The U.S. Supreme Court granted Ring's petition for certiorari and reversed the judgment. The Court began its analysis with the premise, derived from the Arizona Supreme Court's construction of that state's capital sentencing laws, that "[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Ring v. Arizona*, 536 U.S. 584, 597, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). Rejecting the Arizona Supreme Court's reliance on the distinction drawn in *Walton* between elements of an offense and sentencing factors, the Court noted that "*Apprendi* repeatedly instructs in that context that the characterization of a fact or circumstance as an 'element' or a 'sentencing factor' is not determinative of the question 'who decides,' judge or jury." *Ring*, 536 U.S. at 604-05. The Court concluded

> that *Walton* and *Apprendi* are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both. Accordingly, we overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. . . . Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S., at 494, n. 19, the Sixth Amendment requires that they be found by a jury.

(Citation omitted.) *Ring*, 536 U.S. at 609. Accordingly, the U.S. Supreme Court reversed the judgment of the Arizona Supreme Court and remanded the cause for further proceedings not inconsistent with its opinion.

3. APPLICATION OF *RING V. ARIZONA* TO THIS CASE

*Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), was the controlling Sixth Amendment precedent when Gales was sentenced to death on November 6, 2001. Under *Walton*, it was constitutionally permissible to impose a

death sentence on the basis of aggravating circumstances determined by a judge sitting without a jury. However, during the pendency of an appeal in a criminal case, "the execution of the sentence or judgment shall be suspended until such time as the appeal has been determined." Neb. Rev. Stat. § 29-2301 (Reissue 1995); *Jones v. Clarke*, 253 Neb. 161, 568 N.W.2d 897 (1997). A sentence is not a final judgment until the entry of a final mandate of an appellate court. *Jones, supra*; *State v. Warner*, 192 Neb. 438, 222 N.W.2d 292 (1974). *Ring* was decided during the pendency of this automatic direct appeal, at a time when Gales' sentences had not yet become final. The Supreme Court has held that new constitutional rules apply to all state or federal cases which are pending on direct review or are not yet final when the rule is announced. *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987). Because *Ring* is now the law of the land and Gales preserved the Sixth Amendment issue it addresses prior to his sentencing, we are required to review his death sentences in accordance with the constitutional principle announced in *Ring*.

The statutory capital sentencing procedures under which Gales was sentenced required the judge to base the sentence imposed on three considerations:

(1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death;

(2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

§ 29-2522. Gales argues that under *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), all three considerations must be submitted to a jury. We conclude that the holding in *Ring* is not that broad. In characterizing Ring's claim as "tightly delineated," the U.S. Supreme Court stated:

[Ring] contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See *Apprendi v. New Jersey*, 530 U.S. 466, 490-491, n. 16 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted)). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See *Proffitt v. Florida*, 428 U.S. 242, 252 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See *Apprendi*, 530 U.S., at 477, n. 3 (Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' ").
*Ring*, 536 U.S. at 597-98 n.4.

While one member of the Court concurred in *Ring* based upon his opinion that "jury sentencing in capital cases is mandated by the Eighth Amendment," no other Justice joined in this concurrence. *Ring*, 536 U.S. at 614 (Breyer, J., concurring in judgment). Accordingly, we interpret *Ring* as affecting only the narrow issue of whether there is a Sixth Amendment right to have a jury determine the existence of any aggravating circumstance upon which a capital sentence is based.

In holding that such a right existed under Arizona's capital sentencing scheme, the U.S. Supreme Court emphasized that while the statute authorized a maximum sentence of death for the offense of first degree murder, it required the finding of an aggravating circumstance before a death sentence could be imposed. Applying the principle of *Apprendi v. New Jersey*, 530

U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), that it is the function, not the characterization, of a fact or circumstance which determines " 'who decides,' judge or jury," the Court held that because aggravating circumstances under the Arizona statute "operate as 'the functional equivalent of an element of a greater offense,' *Apprendi*, 530 U.S., at 494, n. 19, the Sixth Amendment requires that they be found by a jury." *Ring*, 536 U.S. at 605, 609.

At the time of Gales' trial and sentencing, Nebraska statutes classified murder in the first degree as a Class IA felony punishable by life imprisonment or a Class I felony punishable by death, depending upon the factual determinations made under §§ 29-2520 to 29-2524. See Neb. Rev. Stat. §§ 28-105(1) (Cum. Supp. 2002) and 28-303. Under these statutes, a death sentence could not be imposed absent the existence of at least one of the aggravating circumstances set forth in § 29-2523. *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986). Stated another way, a person convicted of first degree murder in Nebraska was not "eligible" for the death penalty unless the State proved one or more of the statutory aggravating circumstances beyond a reasonable doubt. See, *Tuilaepa v. California*, 512 U.S. 967, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994); *State v. Moore*, 250 Neb. 805, 553 N.W.2d 120 (1996), *disapproved on other grounds, State v. Reeves*, 258 Neb. 511, 604 N.W.2d 151 (2000). In this sense, our capital sentencing scheme was similar to that of Arizona, and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), therefore requires that in order to fulfill the guarantee of rights conferred by the Sixth Amendment, the existence of any aggravating circumstance utilized in the imposition of Gales' sentence of death, other than a prior criminal conviction, must be determined by a jury.

It is clear that the jury made no explicit determination that any of the statutory aggravating circumstances existed in this case. Instead, that determination was made by a judge. This procedure violated the constitutional principle articulated in *Ring*, and Gales' death sentences imposed on each count of first degree murder must therefore be vacated.

## 4. RESENTENCING

This court lacks statutory authority to resentence a criminal defendant to death in a homicide case when we have found a reversible error in the sentencing proceedings. *Reeves, supra.* The parties agree that this cause must be remanded to the district court for resentencing based upon *Ring* error. They disagree, however, as to the law applicable to resentencing and the permissible scope thereof. On July 5, 2002, Gales filed in this court a motion to vacate his death sentence and a request for the imposition of a sentence of life imprisonment. In this filing, Gales stated:

> The U.S. Supreme Court has recently determined that no one can be given a death sentence unless the sentence is imposed by a jury. Ring v. Arizona No. 01-488 slip op. (U.S.S. Court June 24, 2002). Since the appellant was sentenced by a single judge to a death sentence, and since his appeal was pending before this court at the time that Ring, supra, was decided, this [c]ourt should vacate the death sentence and impose a sentence of life imprisonment because the death sentence was incorrectly imposed.

The State filed a response in which it asserted that "[a]lthough *Ring* does not require jury sentencing, *Ring* does require jury fact finding in the penalty phase of a Nebraska first degree murder trial." The State concluded:

> The appropriate relief would be an order of remand to the district court to conduct a new penalty phase hearing in the following manner: (a) the summoning and selection of a jury, by the same means any criminal jury is summoned and selected when required by the 6[th] Amendment, to hear the State's evidence of aggravating circumstances; (b) specific findings of the jury as to which, if any, of the statutory aggravating circumstances upon which evidence was offered by the State have been proven to exist beyond a reasonable doubt; (c) the dismissal of the jury once that fact finding is completed; and (d) the determination of an appropriate sentence by the trial court under §§ 29-2520 and 29-2522 based upon the factual findings of the jury and the record of that proceeding.

It was in this procedural posture that the case was originally briefed and argued to this court on November 5, 2002.

On November 26, 2002, while this matter was under submission, the State filed a "Notice of Legislation" advising this court that during a special session, the Nebraska Legislature enacted 2002 Neb. Laws, L.B. 1, of the 97th Legislature, Third Special Session, with the emergency clause "to satisfy the new 6th Amendment requirements articulated in *Ring.*" The State requested that this cause be remanded for resentencing pursuant to L.B. 1. Gales filed a written objection to this request in which he renewed his request that he be resentenced to life imprisonment. We ordered supplemental briefs on the issues raised by the State's request that we remand for resentencing pursuant to L.B. 1.

### (a) L.B. 1: Content

L.B. 1 was enacted with the emergency clause and signed by the Governor on November 22, 2002. The new legislation amends various statutes dealing with the offense of murder in the first degree, including the capital sentencing statutes codified in chapter 29, article 25, of the Nebraska Revised Statutes. Section 29-2519, which sets forth the Legislature's statement of intent with respect to the capital sentencing statutes, is amended by § 10 of L.B. 1 to include the following additional language:

(2) The Legislature hereby finds and declares that:

(a) The decision of the United States Supreme Court in Ring v. Arizona (2002) requires that Nebraska revise its sentencing process in order to ensure that rights of persons accused of murder in the first degree, as required under the Sixth and Fourteenth Amendments of the United States Constitution, are protected;

(b) The changes made by this legislative bill are intended to be procedural only in nature and ameliorative of the state's prior procedures for determination of aggravating circumstances in the sentencing process for murder in the first degree;

(c) The changes made by this legislative bill are not intended to alter the substantive provisions of sections 28-303 and 29-2520 to 29-2524;

(d) The aggravating circumstances defined in section 29-2523 have been determined by the United States Supreme Court to be "functional equivalents of elements

of a greater offense" for purposes of the defendant's Sixth Amendment right, as applied to the states under the Fourteenth Amendment, to a jury determination of such aggravating circumstances, but the aggravating circumstances are not intended to constitute elements of the crime generally unless subsequently so required by the state or federal constitution; and

(e) To the extent that such can be applied in accordance with state and federal constitutional requirements, it is the intent of the Legislature that the changes to the murder in the first degree sentencing process made by this legislative bill shall apply to any murder in the first degree sentencing proceeding commencing on or after the effective date of this act.

Generally, L.B. 1 makes two significant changes in Nebraska's capital sentencing procedure. First, it provides for an "aggravation hearing" following a determination of guilt in a first degree murder case, at which a jury determines whether aggravating circumstances alleged by the State exist, unless such determination by a jury is waived by the defendant. L.B. 1, § 11. Second, it removes the option of sentencing by the trial judge and requires sentencing by a panel of three judges. *Id.*, § 12. L.B. 1 does not change the statutory definitions of aggravating and mitigating circumstances or the manner in which they are to be balanced. *Id.*, §§ 14 and 15. However, L.B. 1 does amend the specified minimum penalty for a Class IA felony from "[l]ife imprisonment" to "[l]ife imprisonment without parole." *Id.*, § 1. Finally, L.B. 1 includes a severability provision stating that "[i]f any section in this act or any part of any section is declared invalid or unconstitutional, the declaration shall not affect the validity or constitutionality of the remaining portions." *Id.*, § 18.

### (b) L.B. 1: Application

As noted, in enacting L.B. 1, the Legislature expressly stated that it intended the changes to apply to all first degree murder sentencing proceedings commencing on or after November 23, 2002, the effective date of the amendment. L.B. 1, § 10. In his supplemental briefs, Gales makes several arguments why the provisions of L.B. 1 should not be applied in this case on

remand. We interpret these as facial challenges to the constitutionality of L.B. 1.

### (i) Sixth Amendment/Apprendi Challenge

We initially address Gales' argument that L.B. 1 fails to meet the Sixth Amendment requirements defined in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because L.B. 1 does not authorize a jury to weigh aggravating circumstances against mitigating circumstances or conduct a proportionality review prior to the determination of the sentence. Gales acknowledges that *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), does not address these issues because they were not presented in that case. However, he argues that because *Ring* relied upon *Apprendi* in holding that an accused in a capital case has a right to a jury determination of whether aggravating circumstances exist, we should determine, based upon *Apprendi*, that a jury must also conduct the weighing and proportionality review functions of capital sentencing. Based upon a similar rationale, Gales contends that a sentencing judge may not consider facts set forth in a presentence investigation.

■ We reject both arguments. As noted above, we understand *Ring* as recognizing a Sixth Amendment right to a jury determination of the existence of aggravating circumstances which determine "death eligibility," because in the absence of at least one such circumstance, the death penalty cannot be imposed. It is the determination of "death eligibility" which exposes the defendant to greater punishment, and such exposure triggers the Sixth Amendment right to jury determination as delineated in *Apprendi* and *Ring*. In contrast, the determination of mitigating circumstances, the balancing of aggravating circumstances against mitigating circumstances, and proportionality review are part of the "selection decision" in capital sentencing, which, under the current and prior statutes, occurs only after eligibility has been determined. See § 29-2522; L.B. 1, § 14. These determinations cannot increase the potential punishment to which a defendant is exposed as a consequence of the eligibility determination. Accordingly, we do not read either *Apprendi* or *Ring* to require that the determination of mitigating circumstances,

the balancing function, or proportionality review be undertaken by a jury.

Moreover, we note that the constitutionality of judicial sentencing was specifically upheld in that portion of *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), which was not overruled by *Ring*. *Walton* thus remains binding constitutional precedent on this issue, which we are obligated to follow even if we were to read *Ring* as casting doubt on its future viability. The U.S. Supreme Court has clearly stated that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989). Subsequent to the decision in *Ring*, the Florida Supreme Court relied in part upon this principle in denying habeas corpus relief to a person sentenced to death under the Florida capital sentencing statutes which the U.S. Supreme Court found constitutional in *Hildwin v. Florida*, 490 U.S. 638, 109 S. Ct. 2055, 104 L. Ed. 2d 728 (1989), *Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984), and *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), noting that these decisions were not overruled in *Ring*. *Bottoson v. Moore*, 833 So. 2d 693 (Fla. 2002).

Gales' argument that provisions of L.B. 1 which require a sentencing panel to make use of a presentence investigation report are unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), is similarly without merit. Section 9 of L.B. 1 amends Neb. Rev. Stat. § 29-2261 (Cum. Supp. 2000) to include the following language:

> When an offender has been convicted of murder in the first degree and (a) a jury renders a verdict finding the existence of one or more aggravating circumstances as provided in section 29-2520 or (b)(i) the information contains a notice of aggravation as provided in section 29-1603 and (ii) the offender waives his or her right to a jury determination of the alleged aggravating circumstances, the court shall not commence the sentencing determination proceeding as

provided in section 29-2521 without first ordering a pre-sentence investigation of the offender and according due consideration to a written report of such investigation. In capital cases where a jury is not waived, this provision requires the sentencing panel to utilize a presentence investigation only in the selection phase of the capital sentencing, which occurs *after* the defendant has been determined by a jury to be eligible to receive the death penalty. Because the defendant is already exposed to the maximum punishment permitted by law at the time the sentencing panel is required by this statute to consider the presentence investigation report, the statutory provision is not facially unconstitutional under *Apprendi, supra,* or *Ring v. Arizona,* 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

### (ii) Substantive or Procedural Change

■ Gales argues that L.B. 1 "confers a substantive right that previously never existed in Nebraska's death penalty statutes," specifically, "the right to a jury determination of aggravating factors." Supplemental brief for appellant at 5. He argues that this "substantive change in the law . . . is prospective only." *Id.* Statutes covering substantive matters in effect at the time of a transaction govern, not later-enacted statutes. *State v. Groff,* 247 Neb. 586, 529 N.W.2d 50 (1995). However, the procedures and procedural rules to be applied are those which are in effect at the date of the hearing or proceeding, and not those in effect when the act or violation allegedly took place. *State v. Wilcox,* 230 Neb. 123, 430 N.W.2d 58 (1988); *State v. Shiffbauer,* 197 Neb. 805, 251 N.W.2d 359 (1977).

It is of course true that at the time of the commission of the murders for which Gales was found guilty, Nebraska capital sentencing law required the trial judge or a three-judge sentencing panel to determine whether one or more of the aggravating circumstances existed in order to determine whether a defendant found guilty of first degree murder was eligible to receive the death penalty. §§ 29-2520 through 29-2522. With the enactment of L.B. 1 in response to *Ring,* the law has been changed to provide that the existence of aggravating circumstances is to be determined by a jury unless waived by the defendant. L.B. 1, § 11. To determine whether the law as amended can be applied to Gales'

resentencing, we must determine under the foregoing principles whether the change in the law effected by L.B. 1 was substantive or procedural in nature.

We conclude that the change was procedural. The amendment in question does not alter the substantive nature of the statutory aggravating circumstances, one or more of which must be proved by the State beyond a reasonable doubt before the death penalty may be considered for a defendant found guilty of first degree murder. Instead, the amendment simply provides that the existence of one or more aggravating circumstances must now be determined by a jury, instead of by a judge, unless the right to a jury determination is waived by the defendant.

Early in our history, this court twice considered a first degree murder prosecution affected by legislative changes in Nebraska's capital sentencing statutes, *Marion v. State*, 16 Neb. 349, 20 N.W. 289 (1884) *(Marion I)*, and *Marion v. State*, 20 Neb. 233, 29 N.W. 911 (1886) *(Marion II)*. In April 1883, Jackson Marion was indicted for a murder committed in May 1872. He was subsequently tried, convicted, and sentenced to death. In his initial appeal to this court, we determined that at the time of the crime, murder was defined by statute as " 'the unlawful killing of a human being, with malice aforethought, either express or implied,' " and that the prescribed punishment was death or life imprisonment, as determined by the jury trying the case. *Marion I*, 16 Neb. at 351-52, 20 N.W. at 290. After the alleged murder and before Marion's trial, the statute defining murder was amended to define first and second degree murder, with death as the sole prescribed punishment for the former. Marion was tried for first degree murder under the amended statute. This court reversed the conviction, holding that the application of the amended statute violated the ex post facto clause. Because at the time the murder was committed the possible punishment for first degree murder was either life imprisonment or death, but the only possible punishment at the time defendant was tried was death, we determined that it was "evident that the law under which [defendant] was tried 'inflicts a greater punishment than the law annexed to the crime when committed.' " *Marion I*, 16 Neb. at 354, 20 N.W. at 291.

Upon remand, Marion was retried, convicted, and again sentenced to death. He appealed from that conviction. See *Marion II*.

In affirming that conviction, this court addressed whether a provision of the criminal code in effect at the time of the murder should have been applied at trial. The provision stated that " 'juries in all cases shall be judges of the law and the fact.' " *Marion II*, 20 Neb. at 247, 29 N.W. at 918. The provision had been repealed prior to trial. This court noted that the issue presented was "whether or not the right to have the jury pass upon the law was one of which [defendant] could not legally be deprived; the law being in force at the time of the alleged homicide." *Id.* Recognizing the decision in *Marion I*, this court analyzed whether the repeal of the provision "disadvantage[d]" defendant in any way. *Id.* at 248, 29 N.W. at 919. This court concluded:

> The procedure only has been changed. The degree of punishment, the character of the offense, and the rules of evidence, remain as under the former law. It may be observed that the only change in the law is to provide another tribunal to pass upon the law of the case. Prior to the change, if the words in the former code are to be taken at their full meaning and import, the jury were the judges as to the law of a case on trial. After the change the court sits in that capacity and is the judge of the law. No vested right of [defendant] is affected. A new tribunal may be erected, or a new jurisdiction given to try him, and no right is abridged.

*Id.* at 248-49, 29 N.W. at 919. This court further noted that "[r]emedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts in existence when its facts arose." *Id.* at 249, 29 N.W. at 919.

In much the same manner, the most recent amendment to our capital sentencing statutes which reassigns responsibility for determining the existence of any aggravating circumstance from judges to juries effects a procedural change in the law which applies to all proceedings which occur after the effective date of the amendment. See, also, *Brice v. State*, 815 A.2d 314 (Del. Supr. 2003) (finding post-*Ring* change in Delaware statute making jury's determination of existence of aggravating factors binding upon trial judge was procedural change). Thus, the capital sentencing procedures as amended by L.B. 1 apply to the new

penalty phase proceeding which is necessitated in this case by *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

### (iii) Ex Post Facto Challenge

■ Gales also contends that because § 1 of L.B. 1 amended the penalty for a Class IA felony from "Life imprisonment" to "Life imprisonment without parole," application of the amendment would subject him to a more onerous penalty than he faced at his first sentencing in violation of constitutional ex post facto principles. Both U.S. Const. art. I, § 10, and Neb. Const. art. I, § 16, provide that no ex post facto law may be passed. A law which purports to apply to events that occurred before the law's enactment, and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed, is an ex post facto law and will not be endorsed by the courts. *State v. Gray*, 259 Neb. 897, 612 N.W.2d 507 (2000); *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999). This ex post facto analysis applies when a statutory amendment changes the punishment of a crime. *Id.*

■ If, in a subsequent amendment on the same or similar subject, the Legislature uses different terms in the same connection, a court interpreting the subsequent enactment must presume that the Legislature intended a change in the law. *Johnson v. Kenney, ante* p. 47, 654 N.W.2d 191 (2002). Because the language used in L.B. 1 to describe the minimum penalty for first degree murder is clearly different than the prior statutory language, we presume that the Legislature intended to change the minimum penalty. For this reason, we conclude that subjecting Gales to the enhanced minimum sentence of life without parole upon remand for resentencing would violate ex post facto principles.

■ Contrary to Gales' assertions, however, this conclusion does not necessitate a finding that none of the provisions of L.B. 1 may be constitutionally applied to him upon resentencing. To determine whether an unconstitutional portion of a statute may be severed, an appellate court considers (1) whether a workable statutory scheme remains without the unconstitutional portion, (2) whether valid portions of the statute can be enforced independently, (3) whether the invalid portion was the inducement to

passage of the statute, (4) whether severing the invalid portion will do violence to the intent of the Legislature, and (5) whether the statute contains a declaration of severability indicating that the Legislature would have enacted the bill without the invalid portion. See *State ex rel. Stenberg v. Omaha Expo. & Racing,* 263 Neb. 991, 644 N.W.2d 563 (2002). In this regard, § 18 of L.B. 1 expressly provides that "[i]f any section in this act or any part of any section is declared invalid or unconstitutional, the declaration shall not affect the validity or constitutionality of the remaining portions." It is also clear that a workable statutory scheme remains if the "without parole" amendments to L.B. 1 are not applied to Gales. After considering all of the factors, we conclude that although the "without parole" amendments cannot apply to Gales upon resentencing, application of the remaining provisions of L.B. 1 will not violate ex post facto principles. Thus, on remand, Gales is subject to a minimum punishment of life imprisonment.

### *(iv) Scope of L.B. 1's Application Upon Remand*

Gales argues that even if the changes in L.B. 1 are procedural in nature, they cannot apply upon remand because his conviction has not been vacated. This argument is premised upon a misunderstanding of the relief granted by this appeal. Gales alleges, and this court has found, no trial error occurring prior to the acceptance of the guilty verdict and the entry of the judgment of conviction. The only error alleged and found to exist in this appeal occurred during the sentencing phase when the requirements of *Ring v. Arizona,* 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), were not met because the judge, rather than the jury, determined the existence of statutory aggravators. Therefore, the only new proceedings in this cause on remand will be those directly relating to the determination of the existence of aggravating circumstances and resentencing.

Section 29-2520, as amended by L.B. 1, § 11, is the new statutory procedure for the determination of the existence of aggravating circumstances by a jury. We recognize that this procedure is triggered by the filing of a "notice of aggravation," pursuant to Neb. Rev. Stat. § 29-1603 (Reissue 1995), as amended by L.B. 1, § 5, and that no such notice was filed in this case. As amended by § 5 of L.B. 1, § 29-1603 provides in pertinent part:

(2)(a) Any information charging a violation of section 28-303 and in which the death penalty is sought shall contain a notice of aggravation which alleges one or more aggravating circumstances, as such aggravating circumstances are provided in section 29-2523. The notice of aggravation shall be filed as provided in section 29-1602. It shall constitute sufficient notice to describe the alleged aggravating circumstances in the language provided in section 29-2523.

(b) The state shall be permitted to add to or amend a notice of aggravation at any time up to and including the thirtieth day prior to the trial of guilt.

The filing of a notice of aggravation is a new procedure established by L.B. 1. There was no such requirement at the time the information in this case was filed, or at any time prior to Gales' trial and original sentencing. Under the former statute, the State was not constitutionally required to provide a defendant with notice as to which particular aggravating circumstance or circumstances it would rely upon in pursuing the death penalty. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990), *judgment vacated* 498 U.S. 964, 111 S. Ct. 425, 112 L. Ed. 2d 409. While procedural statutes do apply to pending litigation, it is a general proposition of law that new procedural statutes have no retroactive effect upon any steps that may have been taken in an action before such statutes were effective. *State v. Russell*, 194 Neb. 64, 230 N.W.2d 196 (1975). All things performed and completed under the old law must stand. *Id.* We conclude that because the pretrial and trial "steps" of Gales' litigation were completed and became final at a time when the law did not require the State to file a notice of aggravation in order to seek the death penalty, this new procedural requirement is not applicable to Gales.

The district court is therefore directed to conduct proceedings pursuant to § 29-2520, as amended by L.B. 1, in order to determine whether aggravating circumstances exist with respect to each of the two murders committed by Gales. Such determination will be made by a jury impaneled for this purpose, unless waived by Gales. See L.B. 1, § 11 (to be codified as § 29-2520(2)(b)(ii)). The scope of such proceedings will be limited in that the State

may seek to prove only those aggravating circumstances which were determined to exist in the first trial, and as to which Gales is therefore on notice. With respect to the murder of Latara, these include only the aggravating circumstances specified in L.B. 1, § 15 (to be codified as § 29-2523(1)(a), (b), (d), and (e)). With respect to the murder of Tramar, the State may seek to prove only the aggravating circumstances specified in L.B. 1, § 15 (to be codified as § 29-2523(1)(a), (b), and (e)). Upon completion of this proceeding, the district court is directed to resentence Gales pursuant to L.B. 1, § 11 (to be codified as § 29-2520(h)), or L.B. 1, §§ 12 and 14 (to be codified as §§ 29-2521 and 29-2522), with a minimum sentence of life imprisonment.

## VI. CONCLUSION

Gales has assigned no error with respect to his conviction and sentence on the charge of attempted second degree murder, and we therefore affirm that portion of the judgment of the district court.

Gales has assigned no error with respect to the guilt phase of his trial on two counts of first degree murder, and we therefore do not disturb the guilty verdicts returned by the jury on those counts or the entry of judgment of conviction thereon by the district court. However, based upon the intervening decision of the U.S. Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), we conclude that reversible error occurred at the penalty phase of the first degree murder prosecution because a judge, rather than a jury, made the finding that statutory aggravating circumstances existed. We therefore vacate Gales' death sentences on both counts of first degree murder and remand the cause to the district court with directions to conduct a new penalty phase hearing and to resentence Gales on those counts.

The provisions of L.B. 1 shall apply to Gales' new penalty phase hearing, with the following qualifications: First, the minimum penalty to which Gales may constitutionally be exposed on resentencing is life imprisonment, not life imprisonment without parole. Second, at the aggravation hearing to be conducted on remand pursuant to § 29-2520 as amended by L.B. 1, the State may seek to prove only those aggravating circumstances specified

in L.B. 1, § 15, to be codified as § 29-2523(1)(a), (b), (d), and (e), with respect to the murder of Latara, and the aggravating circumstances specified in L.B. 1, § 15, to be codified as § 29-2523(1)(a), (b), and (e), with respect to the murder of Tramar.

To the extent that pending motions of the parties seek appellate relief which is not specifically ordered herein, the motions are denied.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED WITH DIRECTIONS FOR
NEW PENALTY PHASE HEARING AND
RESENTENCING ON COUNTS I AND II.